Matt Adamson, WSBA 31731
JAMESON BABBITT STITES
& LOMBARD, PLLC
801 Second Ave. Suite 1000
Seattle, WA 98104
206.292.1994
Attorneys for Defendants

THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EMERALD KALAMA CHEMICAL, LLC,

Plaintiff,

v.

FIRE MOUNTAIN FARMS, INC., a
Washington corporation, and ROBERT
J. THODE and MARTHA ANN THODE,

Defendant.

No. 3:17-cv-05472-BHS

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

**NOTE ON MOTION CALENDAR:
December 21, 2018**

## INTRODUCTION AND RELIEF REQUESTED

Defendants Mr. and Mrs. Thode and their family company Fire Mountain Farms, request summary judgment dismissing Emerald Kalama Chemical's claims. Emerald's costs to test material everyone knew was "benign," costs to pump clean water onto crops and into a river, and expected future costs to remove "benign" material, are not recoverable under CERCLA.

## FACTS

Robert J. Thode and Martha Ann Thode are a married couple, of retirement age, and residing in Lewis County, Washington.  Along with their adult son and his family, the Thode family farms several properties in Lewis County, the main three of which are located at 856 and 1027 Burnt Ridge Road, Onalaska, WA; 349 State

Route 508, Chehalis, WA; 307 Big Hanaford Road, Centralia, WA; and at mile post 8, Lincoln Creek Road, Centralia, WA (the "Farms").   (Dkt. 30 pp. 1-2, ¶ 2)

In addition to being farmers, Mr. and Mrs. Thode also used to operate a biosolids business on these three properties, transporting biosolids from municipal wastewater treatment plants to storage lagoons/bunkers on each property for use as fertilizer.  This, of course, is perfectly safe and legal.  As the Washington Department of Ecology says:

> Biosolids have been studied extensively in hundreds of peer-reviewed scientific studies. Studies on trace elements and other compounds have looked at a variety of impacts to soil, plants, wildlife, and people. Investigations have evaluated toxicity of compounds, leaching, and contaminant transfer to plants and people. These studies have found biosolids to be safe when managed under current guidelines.
>
> In Washington, scientists from the University of Washington, Washington State University, and other institutions have tested crops fertilized with biosolids. The U.S. Environmental Protection Agency and the National Academy of Sciences have also evaluated biosolids and found them to be safe when properly managed. …
>
> … Are biosolids poop? No, they're not. During the wastewater treatment process, bacteria digest the organic material that we flush down the drain. Then the bacteria themselves die, becoming a stabilized material that can be a valuable source of fertilizer and help improve soil quality.
>
> https://ecology.wa.gov/Waste-Toxics/Reducing-recycling-waste/Organic-materials/Biosolids/Learn-about-biosolids

(Dkt. 30 p. 2, ¶ 3)

Mr. and Mrs. Thode, and their company Fire Mountain Farms, also accepted "sludge" that is very similar to biosolids from Emerald.   From 1995 to 2014, Mr. and Mrs. Thode accepted Emerald's sludge, mixed it with the municipal biosolids, and used the "Mixed Material" as a fertilizer on their fields at the three Farms. (Id. ¶ 4)

Emerald is a subsidiary of a global chemical conglomerate, Emerald Performance Materials.  Emerald's sludge is created at its chemical plant in Kalama, Washington.  Emerald's plant processes wastewater in an onsite treatment system,

which processes storm water, groundwater, and laboratory wastewater. The groundwater and laboratory wastewater are "listed" dangerous wastes with the waste codes U220 for toluene, and F003 for benzene per WAC 173-303- 081(1) and 173-303-082(1). These listed codes apply because of toluene in the groundwater that is processed at Emerald's plant, and trace amounts of benzene are also processed due to *de minimis* spills in the laboratory at the plant. (Dkt. 30 p. 8-9)

The wastewater streams are treated onsite in a biological wastewater treatment system. The end result is to separate the treated water from the sludge. The water – despite being derived from water with listed dangerous wastes - is discharged into the Columbia River.[1]  As for the sludge, as Emerald certified to the EPA, the "industrial WWTP can operate with exceptional efficiency to chemically transform the target chemicals into benign compounds." (Dkt. 30 p. 25)

Under the EPA's "derived from rule," Emerald's sludge retains the listed waste codes for toluene and benzene because the sludge is "derived from" the groundwater and lab water. <u>That the sludge retains the listed waste codes does not mean that it has any of the characteristics of hazardous waste</u>. The sludge - and the water that Emerald is allowed to discharge into the Columbia River - are each the result of a treatment process that removes the toluene from the groundwater and any benzene from the laboratory wastewater. (Dkt. 30 pp. 9, 23)

All tests show the resulting water and sludge have no characteristics of hazardous waste, and are not a threat to human health or the environment. (Id. pp. 23-26, 41)  As Emerald recently (during this case) certified to the EPA in seeking to have the Mixed Material "delisted" in three separate (but nearly identical) delisting petitions:

---

[1] https://ecology.wa.gov/Regulations-Permits/Permits-certifications/Industrial-facilities-permits/Emerald-Kalama-Chemical

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 3

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000          TEL. 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

Emerald and FMF request delisting of the RCRA waste codes attached to the mixed material, so that the material can be disposed of in a Subtitle D landfill rather than requiring that <u>this benign material</u> be sent to a RCRA Subtitle C landfill. .. (Dkt. 30 pp. 24, 63, 99)

… The mixed material [at the FMF sites] has been determined not to exhibit the characteristics of ignitability, corrosivity, or reactivity. The mixed material does not exhibit the characteristic of toxicity, either by the federal or WA state definitions. The mixed material is not a persistent dangerous waste. <u>There has been no damage to human health or the environment from the management of the mixed material</u>. …… (Id. pp. 37, 75, 112, emphasis added)

… Emerald's IWBS are basically the same material as municipal biosolids. <u>The Emerald IWBS do not meet any of the criteria for which the waste was listed as hazardous and there are no constituents (or other factors) that could cause the waste to be a hazardous waste</u> …(Id. p. 26, 65,  101 emphasis added)

… Emerald had fish bioassays performed on the IWBS in 2000 and 2014. The percent mortality of the rainbow trout was zero for both tests…. (id. p. 27, 66, 102)

For over twenty years, the arrangement between Mr. and Mrs. Thode and Emerald appeared to be the poster child for recycling of industrial waste: saving space in landfills, safely fertilizing crops, saving tens-of-millions of dollars for Emerald vs. what it would have paid to send its sludge to a hazardous waste landfill, and providing income and jobs for rural Americans.

Unfortunately, in 2014, after 20 years of allowing this arrangement, the Washington Department of Ecology ("Ecology") suddenly decided otherwise.  (*See e.g.* Dkt. 19-1 pp. 2-31)  Despite knowledge and approval of the arrangement for twenty years, and knowledge of the contents of Emerald's "benign" sludge since at least 2001, Ecology decided that the Emerald sludge was a "listed" hazardous waste that could no longer be delivered to Mr. and Mrs. Thode. (Dkt. 30 p. 3, ¶ 5)

Far worse for everyone, but particularly for Mr. and Mrs. Thode, Ecology also ordered Mr. and Mrs. Thode, FMF and Emerald to remove all of Emerald's sludge

and the municipal "biosolids" it was mixed with (the "Mixed Material") from Mr. and Mrs. Thode's properties and take it to a RCRA Subtitle C hazardous waste landfill, at a cost of millions of dollars, and prohibited any further application of any new biosolids onto the three Farms where the Mixed Material had been applied for twenty years, thus effectively destroying their biosolids business. Ecology also ordered testing of the Mixed Material, and ordered Emerald, FMF, and Thode to take steps to prevent the storm water in the storage impounds from overtopping. (Id)

Emerald, FMF and Thode obtained a "contained-in" determination for the Farm fields and the storm water that had accumulated on the Mixed Material. This allowed the storm water to be applied to the Farm fields when conditions allowed, or to otherwise be trucked to Emerald's plant and discharged into the Columbia River. The "contained-in" determination was granted because the storm water – just like the Mixed Material on which it had accumulated - was not hazardous. (Id. p. 4 ¶¶ 8-9, p. 135, 137)

As for the Mixed Material, Emerald and FMF have asked the EPA to "delist" the Mixed Material in three delisting petitions, one for each Farm. (Dkt. 30 pp. 22-133) If the Mixed Material is delisted, it will no longer be a listed hazardous waste and need not be treated as such, saving millions of dollars in disposal costs. (Id. pp. 22, 61, 97, 147)

Whether delisted or not, the Mixed Material is not actually hazardous. In the delisting petition to the EPA, Emerald has certified to the EPA:

> … The mixed material [at the FMF sites] has been determined not to exhibit the characteristics of ignitability, corrosivity, or reactivity. The mixed material does not exhibit the characteristic of toxicity, either by the federal or WA state definitions. The mixed material is not a persistent dangerous waste. There has been no damage to human health or the environment from the management of the mixed material. (Id. pp. 37, 75, 112, emphasis added) …

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 5

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000          TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

Emerald and FMF request delisting of the RCRA waste codes attached to the mixed material, so that the material can be disposed of in a Subtitle D landfill rather than requiring that <u>this benign material</u> be sent to a RCRA Subtitle C landfill.[2]  ((Dkt. 30 pp. 24, 63, 99)

Recall that the Mixed Material was applied as a fertilizer, without harm to human health or the environment, for almost twenty years.  Test results showed no contamination in the fields.  No one is considering remediation of the fields where it was applied for twenty years.  The "benign" nature of the Mixed Material, including the fact that it could safely be used as fertilizer, is simply not disputed by these parties.  (Id. p. 2 ¶ 4, p. 4, ¶¶ 8-10, pp. 22-133; 152-165)

Given that Emerald has not retained an expert (who would have to contradict its delisting petitions in order to support Emerald's claims in this case), Emerald appears to be relying solely on Ecology's enforcement of the disposal regulations to support its claims.  (Adamson Decl. Ex. A, pp. 7-9)  However, at no time did Ecology determine that the Mixed Material was an "actual and real threat" to human health and the environment.  As Ecology wrote, "Ecology's orders are not based upon a finding that Emerald's sludge exhibits a dangerous waste characteristic. … Ecology does not have enough information to know whether the sludge in fact poses risks to human health and the environment.  … Without the information provided by a complete delisting petition, it is impossible to know whether the waste is 'benign.'" (Dkt. 30 pp. 142-144, 147)  And as Ecology and Emerald agreed in addressing the issues presented in Ecology's orders, "this case is not about harm to human health or the environment."  (Id. p. 155)

---

[2] While the material could be safely used as a fertilizer as had been done for twenty years, Ecology is conditioning delisting on an agreement to send the material to a non-hazardous waste landfill. It will cost millions of dollars to clean out the impoundments and transport the material to a landfill once delisting is granted.  That is still millions less than it would have been to send the benign material to a hazardous waste landfill.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 6

Jameson Babbitt Stites & Lombard, p.l.l.c.
Attorneys at Law
801 Second Avenue
Suite 1000          Tel. 206 292 1994
Seattle, WA 98104-4001  Fax 206 292 1995

Ecology even offered a solution to its belated enforcement of the waste disposal rules when a benign material is unfortunately brought under Ecology's regulatory regime:

> If Emerald and Fire Mountain Farms are correct that the listed dangerous waste sludge poses no risk of harm to human health and the environment, then either party may petition Ecology and EPA to delist the sludge as a dangerous waste.  A delisting petition is the process to evaluate the actual risks (as opposed to legally presumed risks) that may be presented by the sludge.  (Id. p. 150)

Emerald and FMF have since filed the delisting petitions with Ecology and the EPA, in which Emerald certifies that the Mixed Material is "benign" and does not pose a threat to human health or the environment.  As Ecology wrote at the time it was actively enforcing its orders, "the purpose of a delisting petition is to systematically determine whether a listed dangerous waste material like Emerald's industrial sludge 'is not capable of posing a substantial present or potential threat to public health or the environment when improperly treated, stored, transported, disposed of or otherwise managed."  (Dkt. 30 p. 147 quoting WAC 173-303-072(4))

Emerald's Environmental, Health, Safety and Security Manager, Christopher Wrobel, has also previously testified that the EKC Sludge was benign and did not have any characteristics that would make it hazardous to human health or the environment.  (Id. pp. 8-13)

When asked in discovery whether there was ever, or remains, a threat to human health of the environment, Emerald initially answered that it planned to address the issue with an expert witness.  In supplemental answers, Emerald simply argued that "Ecology orders requiring corrective action to address the threat to human health and the environment remain in place."  (Adamson Decl. Ex. A pp. 7-9) Emerald's current interpretation of Ecology's orders is wrong (see e.g. Dkt. 30 p. 142-147) and the polar opposite of its prior interpretation of those orders, when Emerald

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 7

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000          TEL. 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

noted "As Ecology acknowledges, 'this case is not about harm to human health or the environment.'" (Dkt. 30 p. 155)

Mr. and Mrs. Thode hired Janet Knox of Pacific Groundwater Group as their expert in this case. She reviewed her test results on the Mixed Material from 2014, and the 2017 test results from Emerald's testing company. She concluded that (1) the Mixed Material does not pose a threat to human health or the environment; (2) that the water that Ecology allowed to be pumped onto farmland or into the river likewise did not pose a threat; and (3) since everyone knew that Emerald's sludge was benign, and that biosolids are safe for use as a fertilizer, there was no reasonable scientific basis for testing the Mixed Material to determine if it posed a threat. Combining one benign material with another benign material does not create an actual and real threat. (Dkt. 28 pp. 9-14)

Contrary to its certifications to the EPA, and without any disclosed expert testimony, Emerald seeks to recover millions of dollars for three different types of "necessary" response costs from Mr. and Mrs. Thode: First, Emerald seeks to recover investigation costs. Second, it seeks to recover the cost to pump the storm water that accumulated on top of the Mixed Material in the lagoons and to spray it on the farm fields or truck it to discharge it into the Columbia River. Third, it seeks a declaratory judgment for future costs to remove and dispose of the Mixed Material.

## **EVIDENCE RELIED UPON**

Dkt. 30, Declaration of Robert Thode and the exhibits attached thereto.

Dkt. 28, Expert Report of Janet Knox.

Declaration of Matt Adamson and the exhibits attached thereto.

## **ISSUES**

1. Whether Emerald's claims under CERCLA Section 113 must be dismissed.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 8

2. Whether Emerald's claims to investigatory and testing costs must be dismissed because there was no reasonable scientific need to determine whether two benign substances – biosolids and Emerald's sludge - would, when mixed, pose an actual and real threat to human health or the environment.

3. Whether Emerald's claim for the costs to remove storm water must be dismissed because the water it removed and sprayed on crops and into the river was not a threat to human health or the environment.

4. Whether Emerald's claims to future response costs must be dismissed because the Mixed Material not yet removed is "benign" and not a threat to human health or the environment.

5. Whether Emerald's declaratory judgment claim as to future costs must be dismissed because its claims to past costs must be dismissed.

## LEGAL AUTHORITY

### A. Summary Judgment Standard

In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact.  If the moving party is a defendant and meets this initial showing - by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case - then the inquiry shifts to the party with the burden of proof at trial.

Rule 56(c) mandates the entry of summary judgment .. against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  *Celotex Corp.*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 9

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000        TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

1
2

*v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d
265 (1986)

3
4

**B. <u>Emerald Fails to State a Claim under Section 113</u>**

5
6
7
8
9
10
11
12
13
14

Emerald's First Amended Complaint includes a claim for "contribution" under Section 113.  (*See e.g.* Dkt. 19 p. 8)  This claim must be dismissed because (a) there has been no prior action under Section 106 or 107, and (b) Emerald did not "resolve its liability" with the government prior to bringing this action.  The US Supreme Court held in 2004 that CERCLA does authorize a "contribution" claim without one or the other, holding:   "Our conclusion follows not simply from § 113(f)(1) itself, but also from the whole of § 113. As noted above, § 113 provides two express avenues for contribution: § 113(f)(1) ('during or following' specified civil actions) and § 113(f)(3)(B) (after an administrative or judicially approved settlement that resolves liability to the United States or a State)."   *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167, 125 S. Ct. 577, 584, 160 L. Ed. 2d 548 (2004).

15
16
17
18
19
20
21
22

Instead of using Section 113, a potentially responsible party that incurs costs voluntarily, without having been subject to an action under § 106 or § 107, may bring a suit for recovery of its costs under § 107(a), and any of the defendants sued by such a PRP may seek contribution under § 113(f) because they now will have been subject to an action under § 107. *See Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 933 (9th Cir. 2008);   *see also United States v. Atl. Research Corp.,* 551 U.S. 128, 136, 127 S. Ct. 2331, 2336, 168 L. Ed. 2d 28 (2007) ("Consequently, the plain language of subparagraph (B) authorizes cost-recovery actions by any private party, including PRPs").

23
24
25
26

As such, Emerald's claim for costs already incurred plead under Section 113 must be dismissed.  Its only remaining claim for costs incurred is made under Section 107(a).

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 10

Emerald also seeks a declaratory judgment as to future response costs it expects to incur to remove the Mixed Material.  A declaratory judgment as to future response costs is only available if Emerald first establishes defendants' liability for past response costs.  As the Ninth Circuit has held:

> The declaratory judgment mandated by section 113(g)(2) pertains to 'liability for response costs.' 42 U.S.C. § 9613(g)(2). Such 'liability for response costs' must refer to the response costs sought in the initial cost-recovery action, given that the sentence later refers to 'any *subsequent* action or actions to recover *further* response costs.' *Id.* (emphases added). Therefore, if a plaintiff successfully establishes liability for the response costs sought in the initial cost-recovery action, it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions.  *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1007 (9th Cir. 2010).

### C. <u>Response Costs Are Only Recoverable if they Were Necessary and Consistent with the NCP</u>

To succeed on a CERCLA claim under Section 107(a), a "plaintiff must establish: (1) the site containing the hazardous substances is a facility under CERCLA; (2) a release or threatened release of a hazardous substance has occurred from that facility; (3) the plaintiff incurred response costs as a result of that release or threatened release and those costs were necessary and consistent with the national contingency plan; and (4) the defendant is in one of the categories of entities subject to the liability provisions of CERCLA § 107(a*).*" *Voggenthaler v. Maryland Square*, 724 F.3d 1050, 1061 (9th Cir. 2013).

"Under CERCLA § 107(a)(4)(B), a private party may recover 'any ... necessary costs of response incurred ... consistent with the national contingency plan.' 42 U.S.C. § 9607(a)(4)(B). A plaintiff bears the burden of proving any 'response costs' were necessary and consistent with the NCP.'" *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005).

CERCLA § 9607 "response costs" are only "necessary" if the plaintiff meets its burden to establish that they were incurred to remedy "an actual and real threat to

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 11

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000          TEL. 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

human health or the environment." *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1003 (9th Cir. 2010).

The NCP "is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *City of Colton v. Am. Promotional Events, Inc.-W*., 614 F.3d 998, 1003 (9th Cir. 2010).  The NCP provides "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in [40 C.F.R. § 300.700(c)(5)-(6)], *and* results in a CERCLA-quality cleanup[.]" 40 C.F.R. § 300.700(c)(3)(i) (emphasis added). In turn, § 300.700(c)(5)-(6) provide requirements for worker health and safety, documentation of cost recovery, permit requirements, identification of applicable and appropriate requirements, remedial site investigation, selection of a remedy, and providing an opportunity for public comment concerning the selection of a response action.

"A 'CERCLA-quality cleanup' results if the response action protects human health and the environment through the utilization of permanent solutions and alternative treatment or resource recovery technologies to the maximum extent possible." *Young*, 394 F.3d 858, 864 *quoting Franklin County Convention Facilities Auth. v. American Premier Underwriters, Inc.,* 240 F.3d 534, 543 (6th Cir.2001).

In this case, despite there being no actual threat, Ecology ordered testing of the Mixed Material, Farm fields, and water cap, ordered removal of clean storm water, which it allowed to be sprayed on crops or into the river, and ordered removal of the benign Mixed Material.  Ecology entered these orders because it was unlawful for Emerald to offer or send listed hazardous waste to a farm. S*ee* WAC 173-303-141).   But even illegally dumped material only gives rise to a private cause of action under CERCLA if costs are incurred to remove the material because it poses an

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 12

actual and real threat to human health or the environment, and if such costs are consistent with the NCP. *See City of Colton*, 614 F.3d 998, 1003.

### D. Emerald's Claims For Investigation Costs Must be Dismissed

Mr. and Mrs. Thode incurred costs for testing the Mixed Material, which costs probably exceeded the testing costs incurred by Emerald in response to Ecology's orders.   So both parties are claiming testing costs, though all of defendants' counterclaims are contingent on plaintiff having a claim under CERCLA.[3]

Section 107(a)(2)(B) of CERCLA allows recovery of "costs of response," which includes the costs of "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." *See* 42 U.S.C. § 9601(25)(23). Costs of testing and investigating would thus potentially qualify, <u>if such costs were necessary and consistent with the NCP</u>.  *See id*; *see also Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir. 1986).

As described above, this case involves the mixture of (1) Emerald's sludge, which is a listed hazardous waste <u>that everyone knew was actually benign</u>, with (2) municipal biosolids, which EPA and Ecology agree are safe for land application and do not pose a threat to human health or the environment.  As such, the question on this motion is whether mixing two substances, each of which is safe for land application as a fertilizer, can give rise to "necessary" costs to test (a) the mixed material, (b) the soil where is was applied, and/or (c) storm water that accumulates on top of the mixed material.

Emerald has no evidence to support this element of its claim to recover testing costs.   Emerald simply presents an argument that an actual and real threat must have existed, or Ecology would not have ordered testing.  (Adamson Decl. Ex. A p. 7)

---

[3] As such, if this motion is granted in full, defendants' counterclaims would be voluntarily dismissed.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 13

But argument is not evidence of an "actual and real threat."  As Emerald and Ecology noted at the time, "this case is not about harm to human health or the environment." In referring to "this case," Emerald and Ecology were referring to Emerald's appeal of the orders that Emerald is now relying on.  (Dkt. 30 p. 155)

Moreover, the fact that the government ordered testing cannot automatically or conclusively render such testing costs recoverable under CERCLA.    Rather, there must exist an "actual and real threat."  *Colton*, 614 F.3d 998, 1003.

In this case, there was no reasonable basis to believe that mixing one safe material with another safe material would result in a mixed material that was hazardous to use as a fertilizer.   (Dkt. 28 pp. 13-14)   Prior tests had showed that Emerald's sludge was not a characteristic hazardous waste, did not actually include the two listed substances, and did not pose a threat.  (Id. pp. 9-11, 13-14; Dkt. 30 pp. 25, 27, 64, 66, 100, 102)  Similarly, biosolids have undergone extensive testing over the years to determine that they are safe for use as a fertilizer.  *See supra* p. 2.   The fact that Ecology ordered tests to confirm what was already well known and well-documented – that the Mixed Material was benign – does not bring those tests within the ambit of CERCLA.

To the extent it is even necessary, the only expert to address the issue in this case has opined that there was no reasonable scientific basis for believing that the Mixed Material might have posed an actual and real threat to human health or the environment under the facts of this case and based on the previous testing routinely done by Emerald (as to its material) and routinely done by scientists and governments (as to municipal biosolids).  (Dkt. 28 pp. 13-14)

Again, Emerald has no expert testimony that there was a reasonable scientific basis for testing the Mixed Material, the soil, or the water to determine if there was an

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000        TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

actual and real threat.  Emerald has repeatedly represented that no such threat existed or could have existed because Emerald routinely tested its sludge and found it to be safe. (Dkt. 30 pp. 9-11, 13, 27, 66, 102, 155-56)

Like the rest of its claims, Emerald appears to be relying solely on the fact that a government agency named "Ecology," holding regulatory powers over "environmental" issues, ordered it to do something under the Washington "hazardous waste" regulatory scheme, and therefore costs incurred in response to the order must fall under CERCLA.  But the standard for recovering response costs under CERCLA is not whether the government agency responsible for environmental laws orders some tests.  The standard is whether the costs were "necessary" due to an "actual and real threat" and "consistent with the NCP."  Where, as here, everyone knows that the material is benign, the costs are neither "necessary" *under CERCLA* nor consistent with the NCP.

### E.  Emerald's Claims For Removing Clean Water Must be Dismissed

The next category of "response" costs claimed by Emerald that must be dismissed are the costs to remove storm water from two impoundments and spray it on crops or into the river.

Ecology ordered Emerald and FMF to remove the "water cap" from the waste impoundment at two of the three sites.  Ecology felt the storm water accumulating on top of the Mixed Material was at risk of "overtopping" the impoundments and spilling onto the ground and might find its way to nearby streams or rivers.  After Emerald and FMF proved that the water was not contaminated and actually met federal drinking water standards, Ecology granted a "contained-in" determination finding that the water was not hazardous and allowing Emerald and FMF to apply the water to the ground or into the river.   (Dkt. 30 pp. 3-4)

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 15

Jameson Babbitt Stites & Lombard, p.l.l.c.
Attorneys at Law
801 Second Avenue
Suite 1000          Tel. 206 292 1994
Seattle, WA 98104-4001 Fax 206 292 1995

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Ecology granted the contained-in requests, finding that the storm water "no longer contain a listed hazardous waste when managed in accordance with the Plan."   (Id. pp. 135, 137)   The clean-up "Plan" allowed spraying the water on the farm fields, or trucking it to Emerald's plant and discharging it into the Columbia River. (Id. p. 4)

In sum, the storm water did not contain a threat to human health or the environment.  As such, the cost to remove the water and apply it to crops, or to truck it to the Columbia River, are not "necessary" response costs recoverable under CERCLA.  It should also go without saying that *if there was a threat* to human health or the environment, then spraying water on crops and into the river would not be consistent with the NCP or protective of the environment.  Emerald and Mr. and Mrs. Thode were ordered by Ecology to move clean and safe water from one place to another.  That does not give rise to a claim under CERCLA.  The claim for those costs must be dismissed.

### F.  Emerald's Claims For Future Costs Must be Dismissed

The Mixed Material that is still on defendants' property is a "listed" hazardous waste because it contains Emerald's sludge, and Emerald's sludge is the result of Emerald's processing of groundwater containing toluene and laboratory water sometimes containing trace amounts of benzene.  It is undisputed, however, that Emerald's sludge does not actually contain toluene or benzene.  (Dkt. 30 p. 9, 23, 62, 98)   Emerald's sludge was a listed waste under the "derived-from rule" because it was "derived from" wastewater containing toluene and benzene, even though the sludge did not contain either.  The Mixed Material became a listed waste under the "mixture rule" once Emerald's sludge was mixed with biosolids.

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000          TEL. 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

"EPA has adopted a two-part definition of the term "hazardous waste." First, the agency has published several lists of specific "listed" hazardous wastes. 40 C.F.R. Part 261, Subpart D.  Second, the agency has issued rules providing that any solid waste which demonstrates any one of four characteristics—ignitability, corrosivity, reactivity, and extraction procedure toxicity—will be considered a "characteristic" hazardous waste. 40 C.F.R. Part 261, Subpart C."  *Chem. Waste Mgmt., Inc. v. U.S.E.P.A.*, 869 F.2d 1526, 1529 (D.C. Cir. 1989).

Once EPA lists a waste as hazardous, a party may petition EPA for delisting—exclusion of its specific waste from the generic listing.  42 U.S.C. § 6921(f); 40 C.F.R. § 260.22.  EPA's regulations specify a two-pronged test for granting delisting. First, the petition must demonstrate that the particular waste "does not meet any of the criteria under which the waste was listed as a hazardous waste." *Id.* § 260.22(a)(1). Second, if the Administrator "has a reasonable basis to believe that factors (including additional constituents) other than those for which the waste was listed could cause the waste to be a hazardous waste," then the Administrator must determine "that such factors do not warrant retaining the waste as a hazardous waste." 40 C.F.R. § 260.22(a)(2). *See also id.* § 260.22(d)(2); *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1319 (D.C. Cir. 1988).

As for mixing a listed waste with other material:

The EPA's approach to contaminated environmental media is also consistent with the derived-from and mixture rules established in 1980. *See* 40 C.F.R. §§ 261.3(c)(2)(i), 261.3(a)(2)(iv). These rules provide that a hazardous waste will continue to be presumed hazardous when it is mixed with a solid waste, or when it is contained in a residue from treatment or disposal. … In promulgating the mixture rule, the agency did not presume that every mixture of listed wastes and other wastes would in fact present a hazard. Rather, the agency reasoned that "[b]ecause the potential combinations of listed wastes and other wastes are infinite, we have been unable to devise any workable, broadly applicable formula which would distinguish between those waste

Jameson Babbitt Stites & Lombard, p.l.l.c.
Attorneys at Law
801 Second Avenue
Suite 1000          Tel. 206 292 1994
Seattle, WA 98104-4001 Fax 206 292 1995

mixtures which are and are not hazardous." 45 Fed.Reg. 33,095 (May 19, 1980). The EPA therefore concluded that it was <u>fair to shift to the individual operator the burden of establishing (through the delisting process) that its own waste mixture is not hazardous</u>. *Chem. Waste Mgmt., Inc. v. U.S.E.P.A.,* 869 F.2d 1526, 1539–40 (D.C. Cir. 1989) (emphasis added).

Ecology also has regulations as to what is required to "delist" a listed hazardous waste, which can be found at WAC 173-303-072(3)(a):

> (3) Bases for exempting wastes. To successfully petition the department to exempt a waste, the petitioner must demonstrate to the satisfaction of the department that:
>
> (a) He has been able to accurately describe the variability or uniformity of his waste over time, and has been able to obtain demonstration samples which are representative of his waste's variability or uniformity; <u>and</u>, <u>either</u>
>
> (b) The representative demonstration samples of his waste are <u>not designated</u>[4] DW or EHW by the dangerous waste criteria, WAC <u>173-303-100</u>; <u>or</u>
>
> (c) It can be shown, from information developed by the petitioner through consultation with the department, <u>that his waste does not otherwise pose a threat to public health or the environment</u>. (emphasis added)

Emerald and defendants are now seeking to delist the Mixed Material that is the subject of this lawsuit.  (Dkt. 30 pp. 4, 22-133)  To submit the delisting petitions, Emerald tested the Mixed Material.   Based on those test results, Emerald has certified, as required by law, that the Mixed Material is "benign" and does not pose a threat to public health or the environment.  (*See supra* pp. 4-6)  The only expert to weigh in agrees that there is no threat.  (Dkt. 28 pp. 9-11)  This is not only the conclusion of the chemical tests by all parties, but is the logical result where the same Mixed Material was applied as fertilizer for twenty years and the soil is clean!

---

[4] "Designation" the process of determining whether a waste is regulated under the dangerous waste lists, WAC <u>173-303-080</u> through <u>173-303-082</u>; or characteristics, WAC <u>173-303-090</u>; or criteria, WAC <u>173-303-100</u>.  WAC 173-303-040.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 18

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000          TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

1
2
3
4
5

(Id. p. 10)  Emerald's test results and its certification to the EPA are inconsistent with its claim for a declaratory judgment as to future costs in this case, and is unsupported by any evidence of an actual and real threat.   As such, based on Emerald's certifications to the EPA, supported by Ms. Knox's opinion, Emerald's claim to those future costs must now be dismissed.

6
7
8
9
10
11
12
13
14
15
16
17

Despite its initial promise to do so in response to interrogatories (Adamson Decl. Ex. A, pp. 7-9), Emerald did not retain an expert in this case, and has offered no expert opinions on whether its response costs were "necessary" due to an "actual and real threat to human health or the environment."  (Dkt. 27 p. 3)  Emerald is the plaintiff in this case.   It is Emerald's burden to prove that the costs it seeks are "necessary costs of response."   Emerald cannot meet that burden without expert testimony as a lay witness is not qualified to opine as to whether sludge or water poses a threat to human health or the environment if used as fertilizer as had been done for twenty years.   In any event, as shown in its interrogatory answers, Emerald lacks evidence of the existence of an actual and real threat.  (Adamson Decl. Ex. A p. 9)  As such, the lack of evidence, including expert testimony, needed to establish a mandatory element of its case is a second independent basis for dismissal.[5]

18
19
20
21
22

A third basis for dismissing Emerald's claim to future response costs exists because CERCLA does not allow a declaratory judgment for future response costs unless plaintiff prevails on its claim to past response costs.   As the Ninth Circuit held: "Here, Colton has failed to establish present liability because of its conceded failure to comply with the NCP but seeks a declaratory judgment on *future* liability. Section

23
24
25
26

_____

[5] Mr. and Mrs. Thode, on the other hand, retained Janet Knox of the Pacific Groundwater Group to review her 2014 test results, and the 2017 test results conducted by Emerald for the delisting petitions. Ms. Knox has provided an expert report opining that the Mixed Material could safely be applied as a fertilizer, as has been done for almost twenty years, without any threat to human health or the environment.   Her opinion is consistent with Emerald's position with the EPA and the State of Washington.  (Dkt. 28 pp. 9-14)

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 19

113(g)(2), however, does not provide for such relief." *City of Colton*, 614 F.3d 998, 1007.  For the reasons explained in Sections "D" and "E" above, Emerald has no claim to any present liability.  Therefore, its demand for a declaratory judgment must be dismissed.

Finally, and relatedly, the NCP requires parties to perform a remedial preliminary assessment, and to "eliminate from further consideration those sites that pose no threat to public health or the environment." 40 C.F.R. § 300.420, made applicable by 40 C.F.R. § 300.700(c)(5). Emerald knew there was no threat to human health or the environment long before Ecology decided to belatedly enforce a new interpretation of the waste disposal rules.  The NCP therefore required that Emerald "eliminate [this material] from further consideration."  *Id.*

In sum, Emerald's declaratory judgment claim seeking to recover future costs to remove the Mixed Material must be dismissed because it is undisputed that the Mixed Material is not an "actual and real threat to human health or the environment," Emerald has no evidence to the contrary, and without liability for past costs, Emerald is not entitled to a declaratory judgment as to future costs.

## CONCLUSION

The facts that lead to this case are unfortunate, and Ecology's belated and new interpretation of its regulations and unreasonable demands have created a massive and unfair hardship on Mr. and Mrs. Thode.  Emerald, has likewise been forced to incur substantial costs complying with Ecology's orders.  But it cannot push those costs onto Mr. and Mrs. Thode or FMF under CERCLA.  Emerald's costs were neither necessary nor consistent with the NCP because the Mixed Material, and the rain water falling on it, did not, and does not, poses a threat to human health or the environment. Emerald has not evidence otherwise.  And in fact, Emerald's attempt to simultaneously certify to the EPA that this material is "benign" while pursuing this

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 20

1    case which requires proof of "an actual and real threat," should not be tolerated.  Its

2    claims must be dismissed.

3

4    Date:  November 29, 2018          JAMESON BABBITT STITES &
                                       LOMBARD, PLLC

5

6                                      /s/ Matt Adamson

7                                      Matt T. Adamson, WSBA No. 31731
                                       *Attorneys for Defendants Fire Mountain
                                       Farms, Inc., Robert J. Thode and Martha
8                                      Ann Thode*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 21

JAMESON BABBITT STITES & LOMBARD, P.L.L.C.
ATTORNEYS AT LAW
801 SECOND AVENUE
SUITE 1000          TEL 206 292 1994
SEATTLE, WA 98104-4001 FAX 206 292 1995

CERTIFICATE OF SERVICE

I, Taylor Waggoner, declare under penalty of perjury under the laws of the State of Washington and the United States as follows:

1.     I am a legal assistant with the law firm of Jameson Babbitt Stites & Lombard, P.L.L.C., over the age of 18 years, a resident of the State of Washington, and not a party to this matter.

2.     On November 29, 2018, I caused Defendants' Motion for Summary Judgment to be electronically filed with the clerk of the court using the CM/ECF system which will send notification of such filing to all parties of record.

DATED this 29th day of November, 2018 at Seattle, Washington.

/s/Taylor Waggoner
Taylor Waggoner
twaggoner@jbsl.com

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - 22